UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| RICKY ANTHONY YOUNG,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>SCOTT RUSSELL.<br><br>　　　　　Defendant. | CASE NO. C13-5079 BHS-JRC<br><br>REPORT AND RECOMMENDATION<br><br>NOTED FOR:<br>JANUARY 17, 2014 |

The District Court has referred this 42 U.S.C. § 1983 civil rights action to United States Magistrate Judge J. Richard Creatura. The Court's authority for the referral is 28 U.S.C. § 636(b)(1)(A) and (B), and local Magistrate Judge Rules MJR3 and MJR4.

Defendants ask the Court to enter summary judgment in their favor and dismiss this action (ECF No. 81). The Court recommends granting defendants' unopposed motion for summary judgment . Plaintiff has failed to come forward with evidence to refute the contentions that are in defendants' motion for summary judgment. Defendants offer evidence showing that

REPORT AND RECOMMENDATION - 1

1  plaintiff's transfer furthered legitimate penological goals and that defendants' other actions were
2  not retaliatory and furthered legitimate penological goals. .

3        Contemporaneously with filing their motion for summary judgment, defendants provided
4  plaintiff with a notice that outlines plaintiff's obligation to oppose summary judgment (ECF No.
5  82). Plaintiff did not file a response to defendants' motion and, instead, filed a motion asking the
6  Court to strike defendants' motion for summary judgment (ECF No. 84). The Court denied
7  plaintiff's motion (ECF No. 92). Defendants' summary judgment motion is ripe for review.

8  <u>STANDARD OF REVIEW</u>

9        In federal court, summary judgment is required pursuant to Fed. R. Civ. P. 56(a) if the
10  evidence, viewed in the light most favorable to the nonmoving party, shows that there is no
11  genuine issue as to any material fact. *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th
12  Cir.1997). The moving party bears the initial burden of establishing the absence of a genuine
13  issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The moving party
14  meets that burden by "'showing'-- that is, pointing out to the district court -- that there is an
15  absence of evidence to support the nonmoving party's case." *Id*. at 325. Once the moving party
16  has met its initial burden, Fed. R. Civ. P. 56(e) requires the nonmoving party to go beyond the
17  pleadings and identify facts that show a genuine issue for trial. *Id*. at 323-24; *Anderson v.*
18  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Plaintiff has failed to come forward with facts to
19  controvert defendants' assertions that his transfer and most of the other action taken against him
20  reasonably advanced legitimate penological goals.

21  <u>DISCUSSION</u>

22        Because plaintiff failed to respond to a motion for summary judgment, the Court accepts
23  defendants' unopposed statement of facts:

24

1       Plaintiff, Ricky Anthony Young, has been in DOC custody since 1974. Exhibit 1, Declaration of Timothy Feulner, Attachment A, Deposition of Ricky Anthony Young, p. 16. During his time in DOC custody, he has been writing letters to DOC and government officials. Exhibit 1, Attachment A, p. 17. Since 2001, Plaintiff has written executive staff at DOC headquarters around 600 times. Exhibit 5, Declaration of Debra Dobson, ¶¶ 2, 4. This figure does not account for letters sent to facility staff, kites, or letters sent to non-executive headquarters staff. Exhibit 5, ¶¶ 2, 4. As Plaintiff candidly admits, he uses his letters as a means to manipulate staff and gain what he wants, including favorable transfers and job placements. Exhibit 1, Attachment A, pp. 48-49, 56-57, 71, 82. According to Plaintiff, he is willing to do anything that is necessary to avoid a transfer, including threatening to commit suicide. Exhibit 1, Attachment A, p. 49. Much of Plaintiff's correspondence involves multiple letters sent to multiple people and raising issues that Plaintiff has already written about in the past. Exhibit 1, Attachment A, pp. 19-20; Exhibit 2, Declaration of Dan White, ¶ 11.

      When a letter is written to DOC staff members, they are expected to respond to it. Exhibit 2, ¶ 11. Plaintiff's habit of writing a large number of letters to several different individuals has been a concern for DOC since at least 2003 and has been an issue for Plaintiff at other institutions as well. Exhibit 1, Attachment A, p. 18, 26, Deposition Exhibit 2, Letter from Eldon Vail dated September 22, 2003. Specifically, in 2003, DOC expressed concerns to Plaintiff that his correspondence:

> [U]sually involves threats of litigation, redundancy in the issues raised and condescending remarks. [This] approach has resulted in duplication of staff effort, a wasting of state resources and taxpayer money.

Exhibit 1, Attachment A, pp. 18-20 & Deposition Exhibit 2, Letter dated September 22, 2003. This Court has previously concluded that Plaintiff's "longstanding propensity to send voluminous and repetitive communication to DOC and other state officials has had a serious and substantial impact on the allocation of prison resources." Exhibit 7, Report and Recommendation, Rick A. Young v. Vail, No. 04-5654-RJB (W.D. Wash. Feb. 1, 2006). Yet despite repeated efforts to encourage Plaintiff to not engage in such practices and to address issues at the lowest possible level, Plaintiff continues to engage in such conduct, and it continues to place a significant drain on staff time. Exhibit 2, ¶¶ 7, 11.

      On July 29, 2009, Plaintiff was transferred to Cedar Hall Unit at the Washington Corrections Center (WCC). ECF No. 1, at Attachment B, p. 1. Cedar Hall is a unique unit at WCC because it is WCC's only long-term living unit. Exhibit 3, Declaration of Matthew Cossette, ¶ 3. There is a waiting list of offenders that want to come to Cedar Hall as a result. Exhibit 3, ¶ 3. Cedar Hall has a specific set of expectations and a contract that outlines the expectations for each offender housed in that unit. Exhibit 3, ¶ 4 & Attachment A, Cedar Hall Offender Contract. This contract is given to offenders prior to their transfer to

REPORT AND RECOMMENDATION - 3

1  Cedar Hall and is signed by the offender upon their arrival. Exhibit 1, Attachment
   A, p. 9, 19; Exhibit 3, ¶ 4. Because of Cedar Hall's unique status, offenders are
2  transferred out to [sic] the unit if they have behavioral problems or become safety
   or security concerns. Exhibit 3, ¶ 3. The Cedar Hall Offender Contract
3  specifically indicates that failure to meet those expectations may result in transfer
   from Cedar Unit. Exhibit 1, Attachment A, p. 13; Exhibit 3, Attachment A.
4  Before Plaintiff came to Cedar Hall, he received a sample copy of this contract,
   and he eventually signed the contract. Exhibit 1, Attachment A, p. 9, 13.
5         Shortly after he arrived at WCC, Plaintiff began working in the law
   library. ECF No. 1, at Attachment B, p. 1. He believed that inmates at other DOC
6  facilities should have access to the same forms as inmates at WCC and believed
   that they did not have such access. Exhibit 1, Attachment A, p. 35. Plaintiff met
7  with Scott Russell in 2010 to discuss this issue. ECF No. 1, at Attachment B, p. 1;
   Exhibit 1, Attachment A, p. 38-39. Scott Russell listened to Plaintiff's concerns
8  and told him that he would address the issue with Roy Gonzalez at headquarters.
   Exhibit 1, Attachment A, p. 39. Around the time of this meeting in April 2010,
9  Plaintiff also had a discussion with John Thompson about bringing issues to him
   first and then proceeding to other parties if he was unhappy with Mr. Thompson's
10 response. Exhibit 1, Attachment A, pp. 33-34. Despite this discussion, Plaintiff
   continued to write various letters to staff during this time about various issues
11 from a potential transfer to another institution to clerks that might be hired in the
   law library. E.g. Exhibit 1, Attachment A, pp. 46, 51-52. Plaintiff had another
12 meeting with Scott Russell to address this same issue around ten months later.
   ECF No. 1, at Attachment B at 2. Again, Mr. Russell was reasonable, did not
13 threaten Plaintiff, and indicated that he would follow up with DOC headquarters
   about the issue. Exhibit 1, Attachment A, p. 39.
14        On March 15, 2011, Plaintiff had his first meeting with Associate
   Superintendent Dan White. Exhibit 1, Attachment A, p. 56; Exhibit 2, ¶ 7. Mr.
15 White set up this meeting so that he could discuss with Plaintiff the numerous
   issues that Plaintiff had raised in his letters. Exhibit 2, ¶¶ 6-7. Mr. White did not
16 threaten Plaintiff during this meeting or tell Plaintiff that he needed to cease his
   correspondence. Exhibit 2, ¶ 7. Mr. White simply asked Plaintiff to give WCC
17 staff the courtesy of trying to address Plaintiff's concerns before Plaintiff wrote
   letters to people outside of WCC. Exhibit 2, ¶ 7. After this meeting, Plaintiff
18 continued to write various state officials about the same issues. ECF No. 1, at
   Attachment B, pp. 3-14; Exhibit 1, Attachment A, pp. 58-60; Exhibit 2, ¶ 8.
19        In April 2011, Plaintiff signed a form provided to him by Defendant John
   Thompson who is the law librarian at WCC. ECF No. 1, at Attachment A, p. 1;
20 Exhibit 1, Attachment A, p. 85 & Deposition Exhibit 8, April 13, 2011 Form;
   Exhibit 2, ¶ 9. This agreement was intended to provide Mr. Thompson with the
21 opportunity to address issues involving the law library first. Exhibit 2, ¶ 8. John
   Thompson placed the form on Plaintiff's desk for him to sign. Exhibit 1,
22 Attachment A, pp. 83-84. Mr. Thompson did not threaten Plaintiff or force him to
   sign the form. Exhibit 1, Attachment A, pp. 83-85.
23        Plaintiff filed a grievance about this form and sent a letter to Dan White.
   ECF No. 1, at Attachment B, p. 4; Exhibit 1, Attachment A, pp. 98-99, 102 &
24

REPORT AND RECOMMENDATION - 4

Deposition Exhibit 9, April 22, 2011 Letter. White responded to Plaintiff's letter and again encouraged Plaintiff to address law library issues with John Thompson first. Exhibit 1, Attachment A, pp. 98-99 & Deposition Exhibit 9. Mr. White's letter stated that "the memo issued to you by Mr. Thompson IS NOT restricting you from 'redress of grievances' as your letter suggests. Rather it is intended to clarify for you the proper method for routing work-related concerns that you raise." Exhibit 1, pp. 98-99 & Deposition Exhibit 9.

After Mr. White reviewed the first version of this form, he decided to make some changes to the wording of the agreement. Exhibit 2, ¶ 9. The revised form was signed by Mr. Young on May 18, 2011. Exhibit 1, pp. 94-95 & Deposition Exhibit 12, May 18, 2011 Form. Again, this form was designed to encourage Plaintiff to bring law library issues to Mr. Thompson before writing letters to staff outside of the law library. Exhibit 2, ¶ 9. The language of the form was clarified to make it explicit that Plaintiff could also seek resolution through other options if he disagreed with Mr. Thompson's decision. Exhibit 1, pp. 94-95 & Deposition Exhibit 12; Exhibit 2, ¶ 9.

Throughout 2011, Plaintiff continued to write letters to staff and government officials and file grievances about various matters. ECF No. 1, Attachment B, pp. 4-11; Exhibit 6, ¶ 7. In September 2011, Plaintiff sent a packet of materials to Jean Anderson. ECF No. 1, Attachment B, p. 10. Ms. Anderson did not return these materials to Plaintiff. ECF No. 1, Attachment B, p. 10.

On March 15, 2012, Plaintiff met with Dan White, Jean Anderson, Matthew Cossette, and Jan Austin. Exhibit 2, ¶ 7; Exhibit 3, ¶ 7; Exhibit 4, Declaration of Jan Austin, ¶ 5. This meeting was another attempt to address Plaintiff's concerns. Exhibit 2, ¶ 7. Again, Plaintiff was encouraged to work with facility staff. Exhibit 2, ¶ 7. There was no threat made during this meeting. Exhibit 2, ¶ 7; Exhibit 3, ¶ 7; Exhibit 4, ¶ 5. After the meeting, Plaintiff wrote staff expressing his appreciation for the meeting. Exhibit 3, ¶ 7 & Attachment E, Letter from Plaintiff dated March 15, 2012.

On May 15, 2012, Plaintiff met with Jan Austin. Exhibit 4, ¶ 6. This meeting was intended to address concerns that Plaintiff had expressed about a potential transfer to the Washington State Penitentiary (WSP). Exhibit 4, ¶ 6. Ms. Austin also discussed Plaintiff's habit of writing about other offenders. Exhibit 4, ¶ 7. She indicated that Plaintiff's habit of complaining about other offenders could cause him problems with those offenders. Exhibit 4, ¶ 7. This comment was not meant to be a threat. Exhibit 4, ¶ 7. Ms. Austin was trying to give Plaintiff some honest advice because she was concerned that Plaintiff's practice of complaining about other offenders would create a safety risk for him. Exhibit 4, ¶ 7.

Plaintiff's letter writing continued throughout 2012. Exhibit 6, ¶ 8; ECF No. 1, at Attachment B, pp. 12-16. In July and August 2012, Plaintiff wrote various letters to Matthew Cossette complaining about other offenders. Exhibit 3, ¶ 6 & Attachment B, Letter from Plaintiff dated August 26, 2012, Attachment C, Letter from Plaintiff dated July 10, 2012, Attachment D, Letter from Plaintiff dated July 19, 2012. These letters, among others, demonstrated that Plaintiff was keeping track of offender's and WCC staff's movements and activities. Exhibit 3, ¶ 6 & Attachments B, C, D.

REPORT AND RECOMMENDATION - 5

> In September 2012, Plaintiff met with John Thompson to have a performance evaluation. ECF No. 1, at Attachment B, p. 17. In this performance evaluation, Plaintiff received some poor ratings, but his overall rating was average and the same as it was the year before. Exhibit 1, Attachment A, p. 179 & Deposition Exhibit 22, Letter dated September 10, 2012; Exhibit 3, Attachment F, Custody Review dated September 27, 2012. Plaintiff received these ratings on his performance evaluation because he had been making untrue allegations against the law library, DOC personnel, and other inmate law library clerks. Exhibit 6, Plaintiff's First Interrogatories to Defendant John Thompson and Defendant John Thompson's Objections and Response Thereto, p. 5. Plaintiff also had been asking for special treatment and been trying to coerce staff into getting him another job. Exhibit 6, p. 5.
>
> On September 27, 2012, Plaintiff attended a Facility Risk Management Team (FRMT) Meeting.1 Exhibit 3, ¶ 8. This particular meeting was Plaintiff's annual classification review. Exhibit 3, ¶ 8. At the meeting, Mr. Young's practice of monitoring and tracking other inmates was discussed. Exhibit 3, ¶¶ 6, 9, Attachments B; C; D, & F. Additionally, the FMRT noted that Plaintiff had written letters to DOC staff indicating that he was unhappy at WCC. Exhibit 3, ¶ 9 & Attachment F. Mr. Young was told that his behavior meant that he was no longer appropriate for placement in Cedar Hall. Exhibit 3, ¶ 9. Therefore, a transfer from WCC was recommended and approved. Exhibit 3, ¶ 9 & Attachment F. Plaintiff was transferred on October 24, 2012. ECF No. 1, Attachment B at 19.

(ECF No. 81 pp. 2-7).  Because plaintiff has failed to respond to defendants' motion for summary judgment, this set of facts is unopposed.

## DISCUSSION

1.    Overview of the standards the Court uses in considering a retaliation claim.

Plaintiff alleges that defendants retaliated against him for exercising his First Amendment right to redress government (ECF No. 1).  The Court must consider a number of factors when addressing an inmate's retaliation claim. Inmates retain those rights that are not inconsistent with their status as prisoners or with legitimate penological objectives. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Id*. at 546 (*quoting Price v. Johnston*, 334 U.S. 266, 285 (1948); *Jones v. North Carolina Prisoners' Labor Union,* 433 U.S. 119, 125 (1977); *Wolff v. McDonnell*, 418

REPORT AND RECOMMENDATION - 6

1  U.S., 539, 555 (1974), *Pell v. Procunier*, 417 U.S. 817,822(1974)).  The Court must also

2  consider that "maintaining institutional security and preserving internal order and discipline are

3  essential goals that may require limitation or retraction of the retained constitutional rights of

4  both convicted prisoners and pretrial detainees. '[C]entral to all other corrections goals is the

5  institutional consideration of internal security within the corrections facilities themselves.' *Bell*

6  441 U.S. at 546-7 (*quoting Pell v. Procunier, supra*, 417 U.S., at 823; *see Jones v. North*

7  *Carolina Prisoners' Labor Union, supra*, 433 U.S., at 129; *Procunier v. Martinez*, 416 U.S. 396,

8  412 (1974)).  The Court also acknowledges that prison problems are not susceptible to easy

9  solutions and prison officials are accorded wide difference "in the adoption and execution of

10  policies and practices that in their judgment are needed to preserve internal order and discipline

11  and to maintain institutional security." *Bell* at 547.

12      Within this frame work plaintiff has the burden of showing: (1) a defendant took some

13  adverse action against plaintiff, (2) because of (3) plaintiff's protected conduct and that this

14  action (4) chilled plaintiff's exercise of his First Amendment rights and (5) did not reasonably

15  advance a legitimate correctional goal. *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009)

16  (*quoting Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005)).

17      2.   Plaintiff's transfer from WCC.

18      Defendants contend that prison officials' decision to transfer him was not retaliatory and

19  support that contention with evidence regarding the timing of plaintiff's transfer and the amount

20  of time defendants spent trying to work with plaintiff to address his concerns (ECF No. 81, p.

21  11).  Defendants note that plaintiff had been writing letters for a number of years, but that

22  plaintiff was not transferred until after his annual review when prison officials determined that

23  plaintiff was no longer happy at WCC and that plaintiff had been tracking the movements of staff

24

1  and other inmates.  Also, prison officials based the decision to transfer in part on plaintiff's own
2  statement in making the determination that he was unhappy (ECF No. 81, p.11 citing Exhibit 1,
3  Attachment A, pp. 131-134).  Plaintiff has submitted no evidence to dispute these contentions.
4        Defendants argue that plaintiff's tracking of other inmates and staff raises security
5  concerns and housing plaintiff in Cedar Hall was no longer appropriate (ECF No. 81, pp. 12-13).
6  Defendants also argued that the transfer would reduce tension between staff and plaintiff, which
7  also furthers legitimate penological goals (ECF No. 81. p. 12).  Again, plaintiff did not address
8  defendants' evidence or contentions.
9        Once the moving party has met its initial burden, Fed. R. Civ. P. 56(e) requires the
10 nonmoving party to go beyond the pleadings and identify facts that show a genuine issue for
11 trial.  *Id*. at 323-24; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Plaintiff has
12 failed to come forward with facts to controvert defendants' contention that his transfer and other
13 actions taken against him reasonably advance legitimate penological goals.  Accordingly, the
14 Court recommends granting defendants' motion on this issue. Additionally, the District Court
15 should dismiss defendants Cossette and Rohrer, as this is the only claim against these two
16 defendants.
17     3.    Statements warning plaintiff that using other offenders' names in correspondence
18 could "come back to bite him."
19       Plaintiff alleges that defendant Jan Austin retaliated against him by telling him that using
20 other inmates names in his correspondence could "come back to bite him" (ECF No. 1, at p. 16).
21 Defendants admit that defendant Austin made this statement. Defendants contend that
22 Defendant's Austin's statement was not retaliatory (ECF No. 81, p. 13).  Defendants state that
23 defendant Austin took no adverse action against plaintiff and did not threaten him.  Defendant
24

REPORT AND RECOMMENDATION - 8

1  Austin contends that her statement was a warning to plaintiff that he might have problems with

2  the other offenders (*Id.*).  Defendants argue that the statement would not deter a person of

3  ordinary firmness from exercising their First Amendment rights and that the statement furthered

4  legitimate penological goals concerning plaintiff's safety (ECF NO. 81, pp. 13-14).  Plaintiff has

5  not contradicted defendants' position or come forward with evidence.  The Court recommends

6  granting defendant Austin's motion for summary judgment and dismissing her from this action.

7        4.      Failure to return documents that plaintiff mailed to defendant Anderson.

8        It is uncontested that plaintiff mailed a set of documents consisting of approximately one

9  hundred and eight (108) documents to defendant Jean Anderson with a request that she return the

10 documents to him. It is also uncontested that defendant Anderson did not return the documents.

11 Plaintiff alleges that he developed the "packet" and shipped it to prison staff not only so that he

12 could expose what he considered to be illegal action, but also because he "would be timing to see

13 how long it took for me to exhaust the entire WCC and DOC headquarters chain-of-command."

14 (ECF No. 1, at page 9).  Plaintiff alleges that he marked the documents as legal material. The

15 Court finds that plaintiff's designating the packet as legal material is not relevant once he

16 voluntarily sent them to another person who is not his attorney or acting on his behalf.

17       Defendants contend that the keeping of the documents was not an adverse action.

18 Defendants also contend that defendant Anderson's action were not likely to deter plaintiff from

19 exercising his First Amendment rights.  Further, defendants contend that keeping the documents

20 furthered legitimate penological purposes of keeping track of the documents that plaintiff sent to

21 defendant Anderson and that taking the time to return the documents would have taken time

22 away from her other responsibilities.

23

24

REPORT AND RECOMMENDATION - 9

1       Plaintiff has failed to cite any authority supporting his contention that defendant

2 Anderson was under an obligation to return his documents to him. Nor has plaintiff contested

3 defendants' statement of facts. Defendant Anderson has met her burden of showing that there

4 was a penological reason to keep the documents. The Court recommends granting defendant

5 Anderson's motion for summary judgment and dismissing her from this action.

6       5.      Plaintiff's meetings with Dan White.

7       Dan White is an Associate Superintendent at the Washington State Corrections Center

8 (ECF No. 81, p. 21). Defendants allege that Mr. White met with plaintiff on a number of

9 occasions to discuss the issues raised in plaintiff's correspondence (*id*.). It is uncontested that at

10 the first meeting defendant White asked "plaintiff to give WCC staff the courtesy of trying to

11 address Plaintiff's concerns before Plaintiff wrote letters to people outside of WCC." (ECF No.

12 81, Exhibit 2, ¶ 7). It is also uncontested that plaintiff continued to write state officials about the

13 same issues (ECF No. 81, p. 4 (*citing*, ECF No. 1, at pp. 3-14)).

14      Defendants allege that defendant White did not threaten plaintiff or tell him to cease

15 writing his correspondence. Defendant states:

16      I met with Offender Young on March 15, 2011, and May 9, 2011. During these
        meetings Offender Young was informed that I would appreciate the opportunity
17      to address his issues that were in my control. Offender Young was also
        encouraged to give facility staff the courtesy to try to address his issues that were
18      in our control before soliciting assistance from higher level authority. At no time
        was there any directive or inference for offender Young to cease correspondence
19      with anyone nor were any threats made. Offender Young was also informed that
        if he was not satisfied with our efforts, he was welcome to seek resolution
20      elsewhere. During these meetings Offender Young seemed to appreciate them
        when he was there, but would then leave the meetings and continue to write more
21      letters expressing his displeasure with WCC. Despite repeated discussions about
        addressing Offender Young's issues at the lowest possible level, Offender Young
22      continued to write multiple people letters regarding the same issues.

23

24

REPORT AND RECOMMENDATION - 10

Case 3:13-cv-05079-BHS Document 96 Filed 12/23/13 Page 11 of 15

(ECF No. 81, Exhibit 2, ¶ 7). Defendants argue that even if defendant White made the statement that he was close to finding plaintiff's correspondent threatening, there has been no constitutional violation. Defendants argue that in the context of the meeting plaintiff failed to show that defendant White "intimated some kind of adverse action would follow." (ECF No. 81, p.15). Plaintiff did not respond to defendants' argument or contradict defendants' assertions. The Court has reviewed the April 22, 2011 letter that defendant White sent plaintiff (ECF No. 81, Exhibit 1, attached Exhibit 9). The Court finds that the letter contains no threats and plaintiff's attempt to infer a threat in defendants' statement about plaintiff sending a "barrage of correspondence" is not warranted. The Court recommends granting defendant White's motion for summary judgment and dismissing him from this action.

6. Plaintiff's job evaluation and having plaintiff sign forms limiting his ability to write other persons about his grievances.

Plaintiff alleges that defendant Thompson retaliated against plaintiff by giving him a poor job evaluation, and by having plaintiff sign two forms relating to work in the law library. One of these forms required that plaintiff take his perceived problems to defendant Thompson and not write state officials. Plaintiff signed this form on April 13, 2011. The form stated, in part:

> If I identify an issue that I believe hinders Law Library operations I will speak with the Law Librarian concerning the problem and refrain from writing letters to state officials if I believe the law librarian's solution to the problem does not agree with any potential action I would have taken.

(ECF No. 81, Exhibit 1, Attached Exhibit 8). After signing the form on April 13, 2011, plaintiff exercised his First Amendment rights by filing a grievance stating that Thompson's actions infringed on his First Amendment rights. Dan White clarified that plaintiff was still free to write

to other persons (ECF No. 81, Exhibit 1, Attached Exhibit 9).  Defendant White also modified the form creating the second form which states:

> To encourage communication between the Law Library supervisor and the law clerks, and in an effort to resolve issues at the lowest possible level possible, if you identify an issue that you believe hinders Law Library operations first speak to the Law Librarian concerning the problem. If the issue is not resolved to your satisfaction you may seek remedy through other available options including the grievance process.

Plaintiff signed the modified form on May 18, 2011 (ECF No. 81, Exhibit 1, Attachment A, Exhibit 12).  Plaintiff failed to come forward with any evidence showing that Thompson's actions chilled plaintiff's rights.  Plaintiff also contends that defendant Thompson's September 2012 job evaluation of plaintiff constituted an act of retaliation when defendant Thompson gave plaintiff poor ratings for reliability, personal relations, and communications skills.

Defendant Thompson is entitled to summary judgment. The forms furthers legitimate penological goals of requiring plaintiff to exhaust his issues at the lowest possible level without precluding plaintiff from seeking other redress if he is not satisfied with the response of prison officials.  Further, Thompson's job evaluation reflected plaintiff's own conduct of refusing to address issues with the law librarian before writing staff at higher levels. Defendant Thompson's evaluation also reflected plaintiff's attempts to avoid mandatory Saturday shifts in the law library (ECF No. 81, Exhibit 6 pp. 5-6).  Because these actions furthered legitimate penological goals, they cannot be depicted as retaliation. *Barnett v. Centoni*, 31 F.3d 813, 815-16 (9th Cir. 1994) (*per curiam*) (*citing Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)). The Court recommends granting defendant Thompson's motion for summary judgment on these claims.

       7.      Letters from Superintendent Russell.

Plaintiff alleges that defendant Russell threatened him in a number of letters (ECF No. 1, Attachment B, p. 7).  Plaintiff's vague and conclusory allegations are not supported by the

REPORT AND RECOMMENDATION - 12

1  evidence.  Defendants argue that none of the statements made by defendant Russell in his letters
2  constitute adverse action because of plaintiff's protected activity (ECF No. 81, p. 18).
3  Defendants also argue that there is not a threat of adverse action in any of the letters.  The Court
4  has examined the letters defendants placed in the file and finds that there are no threats and
5  defendant Russell has not taken any action against plaintiff based on his protected activity. (ECF
6  No. 81, Exhibit 1 Attached Exhibits 11, 16, and 19).

7       In the May 10, 2011 letter, defendant Russell tells plaintiff that Department of
8  Corrections headquarters' staff had consulted and determined not to standardize what legal forms
9  would be available at each facility. Defendant Russell also tells plaintiff that "no further
10 discussion on this matter is necessary." (ECF No. 81, Exhibit 1 Attachment A, Exhibit 11).

11      In defendant Russell's January 20, 2012 letter, defendant Russell states that he is
12 responding to three letters and to "a variety of issues, some of them repetitive." Defendant
13 Russell does not threaten plaintiff and specifically tells plaintiff that if he has any issues with
14 persons in his living unit he should immediately alert unit staff (ECF No. 81, Exhibit 1,
15 Attachment A, Exhibit 16).  Defendant Russell also tells plaintiff to focus on plaintiff's job and
16 responsibilities and not on other persons, but the letter contains no threats.

17      Defendant Russell's February 8, 2012 letter is in response to allegations that a situation
18 was not investigated (ECF No. 81, Exhibit 1, Attachment A Exhibit 19).  While the letter does
19 contain the statement "it is time that you cease the slanderous comments you make about me and
20 other administrators.  You certainly are entitled to your opinion; however, please keep that
21 opinion to yourself."  However, defendant Russell does not threaten plaintiff or indicate that any
22 adverse action will occur if plaintiff continues writing other persons.  The evidence defendants
23 place before the Court refutes plaintiff's allegation that defendant Russell took adverse action
24

1 against plaintiff because of plaintiff's protected conduct. *Brodheim v. Cry*, 584 F.3d 1262, 1269

2 (9th Cir. 2009) (*quoting Rhodes v. Robinson*, 408 F.3d 559, 566 (9th Cir. 2005)).

3       The Court recommends granting defendants' motion for summary judgment on this issue

4 and dismissing defendant Russell because the evidence presented does not constitute retaliation.

5       8.      Qualified immunity.

6       Defendants have raised the affirmative defense of qualified immunity from suit (ECF No.

7 81, pp. 19-20). A public official performing a discretionary function enjoys qualified immunity

8 in a civil action for damages, provided that their conduct does not violate clearly established

9 federal statutory or constitutional rights of which a reasonable person would have known.

10 *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)(citations omitted); *see also Anderson v.*

11 *Creighton*, 483 U.S. 635, 638 (1987)("whether an official protected by qualified immunity may

12 be held personally liable for an allegedly unlawful official action generally turns on the

13 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly

14 established' at the time it was taken")(*quoting Harlow*, 457 U.S. at 818, 819); *Sorrels v. McKee*,

15 290 F.3d 965, 969 (9th Cir. 2002). Thus, qualified immunity "'provides ample protection to all

16 but the plainly incompetent or those who knowingly violate the law.'" *Burns v. Reed*, 500 U.S.

17 478, 495 (1991)(*quoting Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The immunity is

18 "*immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511,

19 526 (1985)(italic in original).

20       The Supreme Court established a two-part test for determining whether an official is

21 entitled to qualified immunity. The Court must determine whether the facts, taken in the light

22 most favorable to plaintiff, demonstrate that defendants' conduct violated a federal statutory or

23 constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled in part by Pearson v.*

24

REPORT AND RECOMMENDATION - 14

1  *Callahan*, 129 S. Ct. 808, 818 (2009).  In addition, the Court must ascertain whether the federal

2  statutory or constitutional right at issue was "clearly established" at the time of the alleged

3  violation.  *Id*. at 201.  Although the U.S. Supreme Court's holding in *Saucier* required that the

4  determination of a violation of a federal right be the initial inquiry, the Supreme Court later held

5  "that the *Saucier* protocol should not be regarded as mandatory in all cases, [however] we

6  continue to recognize that it is often beneficial."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

7        The Court has agreed with the arguments raised by defendants in their motion for

8  summary judgment.  Because the Court has not found a constitutional violation the defendants

9  would also be entitled to qualified immunity.

10        Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

11  fourteen (14) days from service of this Report to file written objections.  *See also* Fed. R. Civ. P.

12  6.  Failure to file objections will result in a waiver of those objections for purposes of de novo

13  review by the district judge.  *See* 28 U.S.C. § 636(b)(1)(C).  Accommodating the time limit

14  imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

15  January 17, 2014, as noted in the caption.

16        Dated this 23rd day of December, 2014.

                  J. Richard Creatura
                  United States Magistrate Judge